# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROY MOGEL, TODD D. LINDSAY and JOSEPH R. THORLEY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 07-CA-10955 NMG |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, a subsidiary of UNUMPROVIDENT CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

## Table of Contents

Introduction ............................................................................................................. 1

Background on Retained Asset Accounts and Unum's Use of Those Acoounts ......................... 2

Statement of Facts ...................................................................................................... 3

Argument ................................................................................................................. 7

The Class Should be Certified as it Meets the Requirements of Rule 23 and the
Three Named Plaintiffs Should be Approved as Class Representatives ...................................... 7

Standards Governing Class Certification ........................................................................... 7

The Requirements Of Rule 23(a) Are Satisfied .................................................................... 8

Numerosity Is Satisfied ............................................................................................... 9

There Are Questions Of Law And Fact Common To Plaintiffs And The Class .......................... 9

Unum's Policies and Practices Are Centralized and Uniform Company-Wide ......................... 10

Plaintiffs' Breach of Fiduciary Duty Theory Raises Common Issues of Law ........................... 11

The Claims of the Named Plaintiffs Are Typical of the Claims of the Class ........................... 12

The Named Plaintiffs and Their Counsel Will Fairly and Adequately
Protect the Interests of the Class .................................................................................. 13

Plaintiffs' Evidence Satisfies Rule 23(b)(2) ..................................................................... 14

Conclusion ............................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Adair v. Sorenson,*
134 F.R.D. 13, 17 (D.Mass. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Adames v. Mitsubishi Bank, Ltd.,*
133 F.R.D. 82, 90 (E.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Allison v. Citgo Petro. Corp.,*
151 F.3d 402, 412 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock,*
861 F.2d 1406, 1411-12 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Amchem Prods, Inc. v. Windsor,*
521 U.S. 591, 614 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 14

*Baby Neal v. Casey,*
43 F.3d 48, 64 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Barney v. Saunders,*
57 U.S. 535, 543 (1853) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Berman v. Narragansett Racing Association, Inc.,*
414 F.2d 311, 317 (1st Cir. 1969), cert denied, 369 U.S. 1037 (1970) . . . . . . . . . . . . . 14

*Bolanos v. Norwegian Cruise Lines Ltd.,*
212 F.R.D. 144, 153 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Burstein v. Applied Extrusion Technologies, Inc.,*
153 F.R.D. 488, 491 (D.Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Caranci v. Blue Cross & Blue Shield of Rhode Island,*
194 F.R.D. 27, 40 (D. R.I. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Caranci v. Blue Cross & Blue Shield,*
1999 WL 766974, at *19 (D.R.I. Aug. 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Caridad v. Metro-North Commuter R.R.,*
191 F.3d 283, 291 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*CEIBA, Inc. v. Ford Motor Credit Co.*,
2003 WL 22204560, at *4 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Duhaime v. John Hancock Mutual Life Insurance Company*,
177 F.R.D. 54, 63 (D.Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156, 178 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fournigault v. Independence One Mortg. Corp.*,
234 F.R.D. 641, 645 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gorsey v. I.M. Simon & Co.*,
121 F.R.D. 135, 138 (D.Mass. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Great-West Life & Ann. Ins. Co. v. Knudson*,
534 U.S. 204, 210 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Griffin v. Burns*,
570 F.2d 1065, 1073 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238, 250 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re CBC Cos., Inc. Collection Letter Litig.*,
181 F.R.D. 380, 382 (N.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Leasing Consultants, Inc.*,
592 F.2d 103, 107 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Tyco Intern., Ltd*,
2006 WL 2349338,  (D.N.H. Aug. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Visa Check/Mastermoney Antitrust Litig.*,
280 F.3d 124, 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Kaminiski v. Shawmut Credit Union*,
416 F. Supp. 1119, 1122-23 (D.Mass. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*LaFlamme v. Carpenters Local #370 Pension Plan*,
212 F.R.D. 448, 452 (N.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Leigh v. Engle,*
727 F. 2d 113, 122 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Massachusetts Mutual Life Insurance Co. v. Russell,*
473 U.S. 134, 140-43, & n.8 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mertens v. Hewitt Assoc.,*
508 U.S. 248, 260 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Metro-North Commuter R.R. Co.,*
267 F.3d 147, 155 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 20

*Mogel v. Unum Life Ins. Co. of America,*
547 F.3d 23, 26 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 16

*Parke v. First Reliance Standard Life Ins. Co.,*
368 F.3d 999, 1008 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Reich v. Continental Cas. Co.,*
33 F.3d 754, 756 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rosario v. Livaditis,*
963 F.2d 1013, 1017-19 (7th Cir. 1992), cert. denied, 506 U.S.1051 (1993) . . . . . . . . . 11

*Rossini v. Ogilvy & Mather, Inc.,*
798 F.2d 590, 597-98 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Scholes v. Stone, McGuire & Benjamin,*
143 F.R.D. 181, 185 (N.D. Ill. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Securities and Exchange Comm'n v. Fishbach Corp.,*
133 F.3d 170, 175 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sereboff v. Mid Atlantic Medical Services, Inc.,*
547 U.S. 356, 362 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Telephone Co. of Southwest v. Falcon,*
457 U.S. 147, 156 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tull v. U.S.,*
481 U.S. 412, 424 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Valdes v. Larrinaga*,
    233 U.S. 705, 709 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**STATUTES**

U.C.C. §§ 3-104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. §§ 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. §§ 1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. §§ 1002(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. §§ 1002(21)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. §§§§ 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

29 U.S.C. §§ 1106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. §§1109(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

29U.S.C. §§ 1132(a)(i)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

29 U.S.C. §§ 1132(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**RULES**

Fed.R.Civ.P. 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed.R.Civ.P. 23(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**OTHER AUTHORITIES**

G. Bogert, The Law of Trusts and Trustees §§ 543 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Many Default To The Retained Asset Account,
    101 National Underwriter Life & Health issue 38,
    1997 WLNR 4682274 (September 22, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Restatement 2nd of Trusts §§ 205(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Restatement (First) of Restitution §§ 197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, plaintiffs Roy Mogel, Todd D. Lindsay and Joseph R. Thorley respectfully submit this memorandum of law in support of their Motion for Class Certification (the "Motion").

## INTRODUCTION

This is a single claim class action brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiffs allege that defendant, Unum Life Insurance Company of America ("Unum"), breached its fiduciary duties to them, individually and in the aggregate, by wrongfully converting the proceeds of approved beneficiary claim amounts owed to the plaintiffs, which are ERISA plan assets, and by using them for its own financial gain. Unum, it is thus alleged, violated 29 U.S.C. § 1104(a)(1), which requires plan fiduciaries, such as Unum, to act solely in the interest of plan participants and beneficiaries, and engaged in transactions prohibited by 29 U.S.C. § 1106(b), which provides: "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

On this motion, the plaintiffs seek certification under Fed. R. Civ. P. 23(b)(2) of a class consisting of all persons who satisfy each of the following criteria:

a. At any time during the "class period," defined as (i) that period of time dating from April 5, 1994 and continuing to the present for the putative class members who also were members of the plaintiffs class in *Unum I,* and (ii) the six (6) year period immediately preceding the filing of this complaint for all other putative class members ;

b. They were beneficiaries under group life insurance policies issued by Unum, which are employee benefit plans within the meaning of 29 U.S.C. § 1002 (3); and

c. Under which Defendant paid death benefits through the creation of a Unum Security Account.

For the purposes of this motion, the class described above has a well-defined community of interests in that there are common questions of law and fact among its members, class

1

representatives with claims typical of the class, and class representatives who adequately represent the class.

**BACKGROUND ON RETAINED ASSET ACCOUNTS**
**and**
**UNUM's USE OF THOSE ACCOUNTS**

In 1984, Gerry Goldsholle, the Vice-President of Investment and Fiduciary Services at MetLife from 1983 to 1987, "[i]nvented and implemented the retained asset account ["RAA"] - the business and process of paying insurance beneficiaries and others with a 'checkbook instead of a check[.]' ... The concept generates over $25 billion per year in new deposits for the insurance industry."[1]   Today, Mr. Goldsholle is the chairman and publisher of the Advice & Counsel Newsletter, a targeted publication marketed to insurance companies for distribution to RAA holders.[2]  Advice Publications succinctly explains RAA benefits to insurance companies:  "From an insurance company's point of view, [the Newsletter] helps extend the duration of the accounts, enabling the insurance company to earn a [greater] spread on the proceeds[.]"   A survey commissioned by The Advice Company[3] states that the Newsletter "helps your company retain the proceeds," that "[d]uration is the key to profitability of your program," that a "typical new account generates a … net profit of $780 annually on each account," and concludes that "[r]etaining these accounts is critical to real success of your Retained Asset Account program."[4]

Unum implemented its RAA program in February 1990, euphemistically naming its accounts "Unum Security Accounts" ("Security Accounts").  Ingraham Dep. 12:15-17, 51:19-23

---

1   http://advicecompany.com/goldsholle.htm (visited June 12, 2009) (Exhibit A hereto).
2   The Newsletter is "distributed each month to tens of thousands of beneficiaries[.]" http://advicecompany.com/goldsholle.htm (visited June 12, 2009) and http://advicepublications.com (visited June 12, 2009) (Exhibit A hereto).
3   http://advicepublications.com/survey.htm (visited June 12, 2009) (Exhibit A hereto).
4   "Retention of [RAA] funds has been surprisingly long, ... [o]ur records indicate that of all accounts that were opened eight to nine years ago, fully 21 percent of the accounts and 11 percent of the balances are still in active accounts."  Many Default To The Retained Asset Account, 101 National Underwriter Life & Health issue 38, 1997 WLNR 4682274 (September 22, 1997) (Exhibit B hereto).

59:6-60:23 and Exhibit 54.[5]   State Street Bank's marketing materials (ca 1989) (produced by Unum) touted RAA benefits to Unum ("The Retained Asset System offers a method to delay the actual cash outflow") (Ingraham Dep. Ex. 33, page 668).   Unum's RAA liability is in the range of $400-$600 million.   *E.g.*, Ingraham Dep. Ex. 44 (May 23, 2005 e-mail $600 million), Ex. 46 (November 30, 2005 e-mail $550 million) and Ex. 49 (June 27, 2008 e-mail $400 million).

True to the Goldsholle model, Unum makes money on the spread between what it earns by investing the Plaintiff Class's money and what it "pays"[6] in interest to the Plaintiff Class.   For example, Unum's 2008 financial statement discloses "Total cash and invested assets" of $16.2 billion and "Investment income" of $997 million, resulting in a portfolio yield of 6.15 percent (6.15%).   The cost of Unum's RAA capital (necessary to support a part of the "Total cash and invested assets") is negligible - it "pays" one percent (1%) interest on its RAAs (continuously since September 2003).   Unum's Answer to Interrogatory No. 8 b.   Hence, Unum's spread of more than five percent (5%) that goes straight to profit is in the range of $25 million annually.   E-mail messages obtained in discovery (discussed in detail in the following section of this brief) demonstrate Unum's cynical efforts to keep Security Account balances high.

## STATEMENT OF FACTS

Plaintiffs were beneficiaries of group life insurance policies ("policies") issued by Unum (Complaint and Answer, ¶¶15, 26 and 37).   The policies are "employee welfare benefit plans" within the meaning of 29 U.S.C. § 1002(1) and (3).   Unum is a fiduciary with respect to the administration of the policies and the benefits due thereunder. 29 U.S.C. § 1002(21)(A) (Complaint ¶¶16-17, 27-28 and 38-39).   The Court of Appeals held that Unum is a fiduciary in

---

5   Copies of the relevant portions of Unum's Responses to Plaintiffs' Class Certification Interrogatories  and Plaintiffs' First Request for Admissions and the transcript excerpts taken from the Bessman and Ingraham depositions (as well as exhibits) taken on behalf of the Plaintiffs in this action are appended to the Declaration of Stuart T. Rossman in Exhibit C attached hereto.

6   Unum uses the word "credit" instead of "pay" because Unum does not "pay" interest to Security Account holders until checks are presented to State Street Bank.  The credits to the accounts for interest merely increase Unum's RAA liability until checks are presented.  Bessman Dep. 61-63.

respect to the policies and the benefits due thereunder.  *Mogel v. Unum Life Ins. Co. of America*, 547 F.3d 23, 26 (1st Cir. 2008) ("[T]he sums due plaintiffs remain plan assets subject to Unum's fiduciary obligations until actual payment.").

Plaintiffs submitted valid claims for death benefits to Unum in accordance with the policies (Complaint and Answer, ¶¶20, 31 and 42).  Unum mailed Plaintiffs packets containing a letter and a "checkbook"[7] (Complaint ¶¶21, 32 and 43). The letters stated that (1) Plaintiffs' death benefits, plus applicable interest, had been deposited into a "Unum Security Account," which was described as a checking account established in Plaintiffs' names; (2) Plaintiffs could write checks in amounts ranging from $250 up to the balance of the accounts; and (3) interest would be paid on the funds held in the accounts at a variable rate (Complaint ¶¶21, 32 and 43).  Unum admits these allegations to the extent that the documents "speak for themselves."  (Answer ¶¶21, 32 and 43.)

Contrary to its representations, Unum deposited no funds into Plaintiffs' accounts when they were established but rather retained the funds and used them for its own financial benefit. Unum did not deposit any funds into the accounts until Plaintiffs presented "checks" drawn on the accounts (Complaint ¶13).  Unum admits (in its interrogatory responses) that no funds were transferred until the beneficiaries' "checks" are presented to State Street Bank for payment:

> When a new life claim is approved, Unum takes two steps.  First Unum sends an approval letter to the beneficiary informing him or her that the claim has been approved.  Second, Unum pays the claim.  With certain exceptions, for life claims equal to or greater than $10,000, Unum requests that State Street open a Security Account.  ...  Unum makes this request each day by sending via FTP file to OSI [Open Solutions, Inc.] information sufficient to open a Security Account[.]  ... OSI and State Street then open an account for each individual.  In the ordinary course, OSI then sends to the beneficiary the welcome information kit, which includes the checkbook.

---

7   Although Unum describes the instruments that it issues to the beneficiaries as "checks," they are actually only drafts, since the Security Accounts are not funded.  *See* U.C.C. § 3-104, Cmt., ¶4. (explaining that "a draft "a draft drawn on an insurance company payable through a bank is not a check because it is not drawn on a bank.) *See* Ingraham Dep. 25:2)

When a beneficiary writes a check on a Security Account, the bank or merchant to whom the beneficiary presents the check decides whether to honor it in the same manner as any check.  As part of the normal banking process, State Street notifies Unum of the amount of all checks written on Security Accounts that are presented to State Street on a given day.  Since July 26, 1996, Unum funds its master account at State Street in that amount each day, and State Street then withdraws the amount and advances monies to the Federal Reserve.  Prior to July 26, 1996, Unum funded its master account every few days with an amount predicted to be sufficient to cover all checks written on a security account over that period.[8, 9]

Unum's Response to Interrogatory No. 8c.

Unum's 30(b)(6) witnesses, Linda Lou Bessman, Assistant Vice President and Deputy Treasurer at Unum Group, and Marlene Ingraham, Vice President of Group Life Claims at Unum, confirmed the foregoing.  Bessman Dep. at 25 ("On a daily basis, we are looking at all of the incoming funds that we have available to us that day and would utilize the available funds from premium collections, from investment income.  And those funds would be used to cover disbursements, such as retained asset clearings.").  *See id*. at 17, 27, 46 and 65.

Through these practices, Unum converted Plaintiffs' funds to its own use and invested the funds for its own financial gain (Complaint ¶¶14, 54).  Plaintiffs assert that these practices violate ERISA's requirement that plan fiduciaries act "solely in the interests of the participants and beneficiaries," and ERISA's prohibition against plan fiduciaries dealing with plan assets in their own interest or for their own account (Complaint ¶¶54-55).  The Complaint seeks to require Unum to disgorge the profits that it earned using their funds and for further relief (Complaint ¶55).  Unum denies the allegations (Answer ¶¶14, 54 and 55).

---

8   *See also* Unum's Responses to Requests for Admission, RFA No. 11:"Unum admits that it invested monies paid via Security Account until the time that the named Plaintiffs or putative class members withdrew those funds from the Security Account or otherwise indicated that they wished to be paid in a different manner."

9.   State Street Bank administered Unum's Security Accounts from February 1990 to May 1999, when it sold its RAA division to BiSys, Inc.  Ingraham Dep. 13:24-14:4.  Effective March 30, 2007 (Doc Nos. 564-566) Open Solutions, Inc. ("OSI"), became the successor in interest to BiSys.  *Id*. at 12:25-13:5.  OSI administers RAAs for approximately 100 insurance companies.  Ingraham Dep. Exs. 47 and 53.  As an adjunct to its obviously profitable administration business, OSI performs studies showing its insurance company customers where they rank in terms of account retention and interest rates "paid."  Ingraham Dep. 84:19-85:2, 101:4-102:14, Ex. 53.

Unum's answers to Interrogatories and Requests for Admission, as well the testimony of its 30(b)(6) witnesses, establish indisputably that Unum self-dealt with plan assets and invested the funds for its own financial gain, thereby violating ERISA's fiduciary standards and prohibited transaction rules. All of its policies, patterns or practices affect not only the named plaintiffs themselves, but similarly victimize the putative class members.

Lest there be any doubt that this illegal scheme for the unlawful detention of money is for Unum's benefit, one only need look at some of the e-mails produced by Unum. These e-mails demonstrate an incredible hubris, all the while ignoring the fact that Unum was playing with other people's money, *e.g.*, "the income we get from the interest spread is substantial, and we will continue to manage the RAA to optimize our earnings." Ingraham Dep. Ex. 48.

In May 2005, Unum employees responsible for setting the interest rate "paid" on Security Accounts rejected the notion of increasing the rate from one percent (1%) to one and one-quarter percent (1¼%) because it would "cost about $1.5 million more in annual interest payments ... [and] those dollars could be better deployed [elsewhere]." Ingraham Dep. Ex. 44. In March 2006, the interest rate crediting team (including Ms. Ingraham), noted that of the "about 100 companies for which the vendor [OSI] manages a RAA ...[,] [o]nly 4 companies have a rate lower than our 1%." Ingraham Dep. Ex. 47. On March 21, 2006, Gary Piccolo (who works in Unum's "finance pricing area") rejected the notion of increasing the interest rate because Unum's retention rate is insensitive to interest rates:

> There is a risk that with such a low [interest] crediting rate [on Unum Security Accounts], we could see heavy withdrawals - but we haven't seen that happen yet. Our persistency[9] in the RAA is comparable with the overall persistency the vendor [OSI] experiences for all customers combined. ... With over $500 million in the RAA, the income we get from the interest spread is substantial, and we will continue to manage the RAA to optimize our earnings. At some point, ... we may need to increase the crediting rate in order to keep the dollars here.

Ingraham Dep. Ex. 48 (emphasis supplied).

---

9   "Persistency" (aka "duration") refers to Unum's retention of money in its RAAs. Ingraham Dep. 102:8-9.

Mr. Piccolo's notions on "persistency" were persistent:  On June 27, 2008, he again counseled against raising the interest rate, despite the fact that doing so would increase Unum's long-term profitability because it would decrease Unum's short-term profitability (and perhaps decrease bonuses?):

> Martha [Leiper], Rob [Hensley], Marlene [Ingraham] and I met last week to discuss the retained asset account crediting rate and strategy.  We are currently crediting 1% to our RAA.  Other insurers average around 2%, with some as high as 4%.  [¶]  We discussed a study by our RAA vendor (Open Solutions) which compared RAA earnings for a high (around 4%) vs. a low (around 1%) interest crediting strategy.  ...  Since we have about $400 million in our RAA, a higher crediting strategy will not only reduce the spread on the new $ coming in, but also on the existing money in the RAA.  <u>So if we adopted a higher crediting strategy, the profit differential between the low and high crediting strategies in the first several years would be even more pronounced and any long term higher profit expectation from the higher crediting strategy would be deferred even farther into the future.  [¶]  Our recommendation is leave our crediting rate at 1%.</u>

Ingraham Dep. Ex. 49 (emphasis supplied).

And finally, on February 16, 2009 Rob Hensley wrote to Marlene Ingraham stating: "Marlene, you were correct that [Unum's investment] portfolio yield is still north of 6% [six percent][.]" Ingraham Dep. Ex. 51.  Hence the spread is "north" of five percent (5%).  Amazingly, Marlene Ingraham did not know what was meant by the term "substantial" as used in Gary Piccolo's e-mail of March 21, 2006.  Ingraham Dep. 109:12-14, Ex 48.  Plaintiffs assert that a "spread" of $25 million per year ($500 million times 5%) is indeed "substantial."

<u>**ARGUMENT**</u>

<u>**THE CLASS SHOULD BE CERTIFIED AS IT MEETS THE REQUIREMENTS OF RULE 23 AND THE THREE NAMED PLAINTIFFS SHOULD BE APPROVED AS CLASS REPRESENTATIVES**</u>

**I.    <u>Standards Governing Class Certification</u>**

Rule 23 permits a case to be maintained as a class action if the prerequisites of Rule 23(a) are satisfied and if the class meets the requirements of any of the three subsections of Rule 23(b). See Fed. R. Civ. P. 23(b); *see also Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  In

an ERISA class action case, as in all class actions, Plaintiffs have the burden of showing each of the Rule 23 requirements are met. *Caranci v. Blue Cross & Blue Shield*, 1999 WL 766974, at *19 (D.R.I. Aug. 19, 1999). "[T]his is a classic 23(b)(2) case, where defendant's alleged actions are generally applicable to the class as a whole and injunctive relief would be appropriate if entitlement to relief is established." *See, Caranci v. Blue Cross & Blue Shield of Rhode Island,* 194 F.R.D. 27, 40 (D. R.I. 2000). Plaintiff must first show that the proposed class meets the Rule 23(a) threshold requirements: numerosity, commonality, typicality, and adequacy. Next the plaintiff has the burden to show the proposed class satisfies one of the three subsections of Rule 23(b). *In re Tyco Intern., Ltd,* 2006 WL 2349338, at *1 (D.N.H. Aug. 15, 2006). However, on class certification, the "question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

A putative class action is "categorized according to the nature or effect of the relief being sought." *In re Tyco Intern.*, 2006 WL 2349338, at *3 (citing *Allison v. Citgo Petro. Corp.*, 151 F.3d 402, 412 (5th Cir. 1998). An ERISA class action will be certified under Rule 23(b)(2) if the defendant acted in a way generally applicable to the class, so that the injunctive relief sought is appropriate with respect to the class as a whole. *Caranci*, 1999 WL 766974 at *19 (holding class certification appropriate when Blue Cross's alleged ERISA violation was generally applicable to the class, and injunction would ensure that all members of the class would be protected). As set forth below, this ERISA class action presents a paradigmatic example of the sort of case the class action device was designed to vindicate. Because the proposed class here satisfies the requirements of Rule 23(a) and Rule 23(b)(2), the class should be certified.

## II.   <u>The Requirements Of Rule 23(a) Are Satisfied</u>

The four threshold requirements of Federal Rule of Civil Procedure 23(a) are: (i) numerosity ("the class is so numerous that joinder of all members is impracticable"); (ii)

commonality ("there are questions of law or fact common to the class"); (iii) typicality ("the claims or defense of the representative parties are typical of the claims or defenses of the class"); and (iv) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). *In re Visa Check/Mastermoney Antitrust Litig*., 280 F.3d 124, 133 (2d Cir. 2001), citing Fed.R.Civ.P. 23(a). Though plaintiffs have the burden of demonstrating that the requirements have been met, *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999), they are "not required to make an extensive evidentiary showing." *LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 452 (N.D.N.Y. 2003). *See also Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 597-98 (2d Cir. 1986) (while satisfaction of Rule 23(a)'s requirements "may not be *presumed*," neither is the plaintiffs' burden onerous) (emphasis in the original). As set forth below, plaintiffs have more than enough evidence to establish all of the elements of Rule 23(a).

### A.    Numerosity Is Satisfied

Rule 23(a)(1) provides that, in any class action, the members of the class must be sufficiently numerous that joinder of all members in impracticable. Fed.R.Civ.P. 23(a)(1). Here, the putative class encompasses thousands of individuals. Ingraham Dep. Ex. 53, page 506 (Unum's vendor for its Security Accounts, OSI, discloses that it was administering 15,053 Unum Security Accounts having aggregate balances of mare than $469 million as of February 28, 2003). This overwhelming number of class members demonstrates that joinder simply is a logistical impossibility. *See, e.g., Gorsey v. I.M. Simon & Co.*, 121 F.R.D. 135, 138 (D.Mass. 1988). In all events, numerosity is not an issue here, as Unum has admitted that "The class proposed in the Complaint in this action is so numerous that joinder of all members is impracticable." Unum's Responses to Requests for Admission, RFA No. 11. Accordingly, plaintiffs have satisfied the numerosity requirement of Rule 23(a).

### B.    There Are Questions Of Law And

## Fact Common To Plaintiffs And The Class

Rule 23(a) requires the presence of either a common question of law or of fact. *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001). *See also Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002) ("[t]he commonality requirement is satisfied if the class shares even one common question of law or fact") (citation omitted). The commonality requirement is a "low hurdle." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). Commonality is satisfied where the named plaintiffs' claims are based on policies, patterns or practices that affect not only themselves, but which similarly victimize the putative class members. *See, e.g., Duhaime v. John Hancock Mutual Life Insurance Company*, 177 F.R.D. 54, 63 (D.Mass. 1997); *Kaminiski v. Shawmut Credit Union*, 416 F. Supp. 1119, 1122-23 (D.Mass. 1976)(each consumer class member borrower treated in similar manner by bank); *Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82, 90 (E.D.N.Y. 1989) ("allegations of similar discriminatory….practices satisfy the commonality and typicality requirements of Rule 23(a))."

While plaintiffs need only identify one practice or policy that affects all class members in order to satisfy the commonality prerequisite, *see, e.g., Robinson*, 267 F.3d at 155, this case involves numerous common questions of fact and law including, but not limited to:

a) Whether Unum engaged in the practices complained of;

b) Whether the practices complained of violate 29 U.S.C. §§ 1104 (a), 1106 (a)(1)(D) and 1106 (b)(1); and

c) The measure of the amount by which Unum unjustly was enriched by using ERISA plan assets for its own financial gain in violation of its fiduciary duties owed to the owners of those assets under ERISA.

These issues are discussed in greater detail immediately below.

### 1. Unum's Policies and Practices Are Centralized and Uniform Company-Wide

Commonality is satisfied where the policies or practices at issue are centralized and apply company-wide. *See, e.g., Rosario v. Livaditis*, 963 F.2d 1013, 1017-19 (7th Cir. 1992), *cert. denied*, 506 U.S.1051 (1993). Here, common questions of fact and law arise because Unum's organizational structure, policies and practices governing the use of "security accounts" for death benefits on group life insurance policies are uniform and apply nationwide.

Instances of Unum's uniformity abound. For death benefits of $10,000 or more, it was Unum's standard procedure for the beneficiary to receive a Unum security account rather than a check. Ingraham Dep. 18:20-19:2. Beneficiaries do not get to choose a payment option. *Id.* 21:22-22:9. Unum has one standard process for "paying" death benefits of $10,000 or more. *Id.* 29:2-31:4. *See also* Unum's Answer to Interrogatory No. 8 c. ("With certain exceptions, for life claims equal to or greater than $10,000, Unum requests that State Street open a Security Account."). There are no differences in the way Security Accounts are administered depending on any language that was in the group insurance policy under which the benefits were provided. Ingraham Dep. 35:15-36:2, 39:9-13. For all Plaintiff Class members, Unum keeps the death benefit money in its general account "[u]ntil such time as the beneficiary negotiates the check[]." *Id.* 36:23-37:23, 93:5-8 and 105:1-2. Unum "pays" the same interest rate to all of the people due benefits under Unum security accounts. *Id.* 39:14-17, 81:10-15. Unum treats all Security Account holders in the same way. Bessman Dep. 65. Unum never informs Security Account holders of the profits that it earns from investing beneficiaries' money. Ingraham Dep. 77:22-78:10. These common facts support class certification.

### 2. Plaintiffs' Breach of Fiduciary Duty Theory Raises Common Issues of Law

Some of the many issues of law that are common to all class members already have been considered by this Court and the Court of Appeals. In particular, this Court considered whether beneficiaries were barred from asserting claims for breach of fiduciary duty because (i) a remedy

was purportedly available under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), *Mogel v. Unum Life Insurance Co. of America*, 540 F.Supp.2d 258, 262-263 (D. Mass. 2008), (ii) whether the Security Accounts constituted payment of benefits such that Unum no longer remained a fiduciary with respect to them, and (iii) whether the "guaranteed benefit policy" exemption applies to the Security Accounts, *Id.* at 264-65.  The Court of Appeals likewise considered these common issues, agreeing with this Court on all but the last of these.  *Mogel v. Unum Life Insurance Co. of America*, 547 F.3d. 23 (1st Cir. 2008).

Plainly, these are all legal issues that are common to the representative plaintiffs and the class.  The commonality requirement of Rule 23(a) is amply met here.

### C.    The Claims of the Named Plaintiffs Are Typical of the Claims of the Class

In order to meet the typicality requirement of Rule 23(a)(3), the named plaintiffs must "possess the same interest and suffer the same injury" as the class members."  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982). *See also*, 1 H. Newberg, *Class Actions,* § 3.13, at 316 (4th Ed. 2002).  The commonality and typicality requirements of Rule 23 "tend to merge."  *Falcon*, 457 U.S. at 157 n. 13.   Thus, much of the discussion above also demonstrates that plaintiffs meet Rule 23(a)(3)'s typicality standard.  *Bolanos*, 212 F.R.D. at 155, *Fournigault v. Independence One Mortg. Corp.*, 234 F.R.D. 641, 645 (N.D. Ill. 2006) ("The issue of typicality is closely related to commonality and should be liberally construed.").

The typicality requirement directs the Court to focus on whether the named plaintiffs' claims have the same essential characteristics as the claims of the class at large.  Typicality is satisfied when the named plaintiffs' and class members' claims arise from similar legal or remedial theories, even if there are substantial factual distinctions between the claims of the named plaintiffs and those of the other class members.  *Burstein v. Applied Extrusion Technologies, Inc.,* 153 F.R.D. 488, 491 (D.Mass. 1994); *Adair v. Sorenson*, 134 F.R.D. 13, 17

(D.Mass. 1991).

In this case, each of the three named plaintiffs asserts that he was the beneficiary of a group life insurance policy issued by Unum, that when his respective decedent died, he received a communication from Unum that stated that the proceeds of the policy "had been deposited" in a Unum "Security Account" as a checking account set up in his name at State Street Bank, that he would receive interest on funds in the account, that he could draw down funds on the account or leave the funds in the Account, but that in fact Unum did not deposit funds to the account until a check in a corresponding amount was drawn on it, and that Unum converted the funds to its own use and benefit until then.  (Complaint, ¶¶21, 25, 32, 36, 43, and 47).  This same process by Unum is likewise alleged for all class members.  (Complaint, ¶¶9-14).

Here each of the plaintiffs asserts the identical claims and requests for relief as are applicable to all class members, arising out of the same pattern or course of conduct.  Although Rule 23(a)(2) does not require that every single question of law or fact raised in the litigation must be common to each class member, such is, in fact, the case here.  It is sufficient that a common course of conduct affecting all class members is alleged.  The standardized course of conduct alleged here satisfies this requirement.  *See, Duhaime,* 177 F.R.D. at 62.

### D. The Named Plaintiffs and Their Counsel Will Fairly And Adequately Protect the Interests of the Class

Rule 23(a)(4)'s adequacy requirement involves the satisfaction of two factors: (i) that plaintiffs' counsel are qualified, experienced and generally able to conduct the litigation; and (ii) that the plaintiffs' interests are not antagonistic to those of the rest of the class. *Amchem*, 521 U.S. at 625; *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d at 142; *Duhaime*, 177 F.R.D. at 64.  Both elements of that test are satisfied here.

First, as to the adequacy of class counsel, all have substantial experience in successfully

prosecuting complex class actions, most notably consumer class actions.[11]  See, Federal Rules of Civil Procedure Rule 23(g)(1).  As they already have illustrated in the extensive briefing previously submitted in this case, the plaintiffs' counsels' current diligence and commitment to this litigation will more than adequately protect the interests of the class.

In addition, there is no conflict of interest between the named plaintiffs and the Class members.  *See Amchem,* 521 U.S. at 626; *In re CBC Cos., Inc. Collection Letter Litig.*, 181 F.R.D. 380, 382 (N.D. Ill. 1998) ("[I]n demonstrating a class representative's adequacy, the burden is not a heavy one") (citation omitted).  To be a concern, such conflict must involve the subject matter of the suit and may not be minor or collateral.  *Berman v. Narragansett Racing Association, Inc.*, 414 F.2d 311, 317 (1st Cir. 1969), *cert denied*, 369 U.S. 1037 (1970).  The named plaintiffs share common interests in this lawsuit with the absent class members, and all seek to establish the existence of Unum's breach of its fiduciary duties and to obtain appropriate remedies.  Accordingly, the Court should find that the named plaintiffs, with the assistance of their experienced counsel, will fairly and adequately protect the interests of the Class they propose to represent.  Accordingly, plaintiffs have satisfied Rule 23(a)(4).

**III.** **Plaintiffs' Evidence Satisfies Rule 23(b)(2)**

The Court can certify a class under Rule 23(b)(2) when the "defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."   Rule 23(b)(2) "remed[ies] systemic violations of basic rights of large and often amorphous classes." *Baby Neal v. Casey*, 43 F.3d 48, 64 (3rd Cir. 1994).

Acting on grounds generally applicable to all class members does not mean that the conduct need be directed at all class members or that it even damaged all class members.  *Griffin v. Burns*, 570 F.2d 1065, 1073 (1st Cir. 1978) ("[N]ot all class members need be aggrieved by or

---

11   The firm resumes for Plaintiffs' counsel are attached as Exhibit D.

desire to challenge defendant's conduct in order for some to seek relief under (b)(2).") (citations and quotations omitted).  The Advisory Committee Notes accompanying the 1966 amendment to 23(b)(2) state that "action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."  Under 23(b)(2), it is the conduct of the defendant--not the effect of the conduct on the plaintiff, that is at issue.  Individualized facts regarding the plaintiffs are not relevant to whether or not the defendant acted on grounds that are generally applicable to the class.

Here, for the same reasons plaintiffs have satisfied the commonality requirement, so too have they satisfied the requirement that Unum has acted in a manner generally applicable to the class.  The focus is on Unum's breach of its fiduciary duties and the equitable remedies required to respond to the violations of ERISA on behalf of all beneficiaries of its group life policies.

Plaintiffs also meet the second element of Rule 23(b)(2) because they seek "final injunctive relief [and] corresponding declaratory relief with respect to the class as a whole."  In particular, plaintiffs ask the Court to issue appropriate injunctive relief enjoining Unum's violations of ERISA and to provide separate declaratory relief including findings that (i) Unum has violated ERISA; (ii) Unum has been unjustly enriched as a result of its violations of ERISA; (iii)  Unum is holding in constructive trust all of the profits that it derived from its wrongful use of the ERISA plan assets that belong to the Plaintiffs and the putative class members; and (iv) Plaintiff and the class members are entitled to require Unum to disgorge all of the illicit profits that it has accrued through its wrongful acts.

ERISA § 502(a)(3) authorizes actions to obtain injunctive and "other appropriate equitable relief" to redress violations of ERISA's fiduciary provisions. 29 U.S.C. § 1132(a)(3). The Supreme Court has held that the term "equitable relief" in this context means "those categories of relief that were typically available in equity," *Great-West Life & Ann. Ins. Co. v.*

*Knudson*, 534 U.S. 204, 210 (2002).  To determine whether a remedy was available in equity, the Court has directed courts and practitioners to examine cases and secondary materials to ascertain whether the relief would have been equitable "[i]n the days of the divided bench." *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 362 (2006).

The Supreme Court recognized in *Knudson* that a constructive trust constitutes "equitable relief" within the meaning of ERISA § 502(a)(3), "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds in the defendant's possession," 534 U.S. at 213-214, and has thrice recognized that "equitable relief" may include the imposition of a constructive trust and the disgorgement of ill-gotten plan assets or profits. *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 260 (1993) ("For even in its more limited sense, the 'equitable relief' awardable under § 502(a)(5) includes restitution of ill-gotten plan assets and profits"); *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (explaining that a constructive trust, coupled with disgorgement, are appropriate equitable remedies to remedy a trustee's breach of trust); *Knudson*, 534 U.S. at 215 (affirming that the equitable restitution described in *Harris Trust*, including disgorgement, "accords with the restitution we describe as equitable today").

Additional case law and secondary materials further confirm that the constructive trust and disgorgement remedies which Plaintiffs seek were "typically available in equity." *Barney v. Saunders,* 57 U.S. 535, 543 (1853) ("It is a well-settled principle of equity, that wherever a trustee, or one standing in a fiduciary character, deals with the trust estate for his own personal profit, he shall account to the *cestui que trust* for all the gain which he has made"); *Valdes v. Larrinaga*,  233 U.S. 705, 709 (1914) (holding that a bill alleging an abuse of a fiduciary relation through a secret transaction from which profits accrued stated a proper case for equitable relief); *Tull v. U.S.*, 481 U.S. 412, 424 (1987) (noting that an action for disgorgement of improper profits was traditionally considered an equitable remedy); *In re Leasing Consultants, Inc.*, 592 F.2d 103,

16

107 (2d Cir. 1979) (describing an "equitable accounting" as being "designed to prevent unjust enrichment by requiring the disgorgement of any benefits or profits received as a result of a fiduciary's breach of the duty of loyalty"); *Reich v. Continental Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994) ("If the beneficiary of a trust sought an accounting of the profits of a defalcating trustee – a form of restitutionary relief – the accounting if ordered would be ordered in a suit in equity, and the remedy would be equitable...."); *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008 (8th Cir. 2004) ("An accounting for profits is one of a category of traditionally restitutionary remedies in equity, and is often invoked in conjunction with a constructive trust"); Dan B. Dobbs, *Law of Remedies*, § 4.3(5), p. 613 (2d ed. 1993) ("The fiduciary accounting for profits was traditionally an equitable claim"); *Restatement (First) of Restitution* § 197 ("Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary").

One of the overriding goals of ERISA is to prevent the misuse and mismanagement of plan assets by fiduciaries. *See, Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 140-43, & n.8 (1985) (discussing congressional purpose of establishing judicially enforceable standard to ensure honest, faithful and competent management of ERISA plan assets). To achieve that goal, ERISA § 409(a), 29 U.S.C. §1109(a), requires a fiduciary to disgorge to an employee benefit plan any profits he makes through improper use of the plan's assets:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

*Id.*

ERISA thus expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of § 1109(a) of the Act specifically provides for the disgorgement of the profits illicitly gained through the improper use of trust assets as the appropriate remedy. *Leigh v. Engle*, 727 F. 2d 113, 122 (7th Cir. 1984). If ERISA fiduciaries breach their duties by risking trust assets for their own purposes, as alleged here, beneficiaries may recover the fiduciary's profits made by misuse of the plan's assets:

> The legislative history of ERISA shows that Congress intended disgorgement of profits to be one remedy available for breach of fiduciary duty. A fiduciary who breaches this duty "must restore to the plan any profits which he made using plan assets." S.Rep. No. 383, 93rd cong., 1st Sess. 105, r*eprinted in* 1974 U.S. Code Cong. & Ad. News 4890, 4988. The disgorgement provisions of §1109(a) are in accord with the common law of trusts. *See* Restatement 2nd of Trusts § 205(b), comment (h), and § 206 comment (j) (1959) ….

*Id.* at fn. 17.

The purpose behind this strict rule is to deter the fiduciary from engaging in disloyal conduct by denying him the profits of his breach. G. Bogert, *The Law of Trusts and Trustees* § 543, at 218 (Rev. 2d ed. 1978). If there is no financial incentive to breach, a fiduciary will be less tempted to engage in disloyal transactions. *Id.* The purpose of the rule is not to make beneficiaries whole for any damages they may have suffered. In fact, whether beneficiaries have been financially damaged by the breach is immaterial. *Id.* at 217. Rather, the objective is to make "disobedience of the trustee to the [duty of loyalty] so prejudicial to him that he and all other trustees will be induced to avoid disloyal transactions in the future." *Id.* at 218.

The key to removing a fiduciary's financial incentive to breach his duty of loyalty is to make sure that the fiduciary, like Unum in this case, is not allowed to keep any ill-gotten profits. Whether the ill-gotten profits are returned to an ERISA plan or ultimately distributed to plan participants and beneficiaries is not critical to effective deterrence. What is critical is denying

the fiduciary any ill-gotten profits. *See*, *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1411-12 (9th Cir. 1988).

Plaintiffs' request for equitable disgorgement does not create individualized issues precluding class certification here.  The total unjust enrichment caused by Unum's ERISA violations can be calculated on a class-wide basis using available, objective information that is contained in defendant's centralized databases.

The information necessary to compute the disgorgement is comprised of essentially two items - income and expense - the difference between the two being the illegal profits that Unum made by investing the Plaintiff Class's money for its own account.  The income side of the equation may be computed by reference to the Unum's annual yields on its investment portfolio. Plaintiffs' counsel have every annual financial statement that Unum filed with the Maine Bureau of Insurance for each year after 1993, hence they are able to determine Unum's portfolio yields from 1994 to 2008.  The expense side is not all that difficult to compute.  Plaintiffs' counsel have the interest rates that Unum "paid" on Security Accounts for all periods after December 1999 as well as most of the periods from April 1994 to December 1999.  Unum's Responses to Interrogatory No. 8 b.  Should it be necessary to compute the amount of disgorgement attributable to each class member, that can be done as well, because (i) Linda Bessman testified that OSI (Unum's Security Account administrator) maintains records of the transactions, interest credited, and balances for each Security Account holder, Bessman Dep. 49, and (ii) the balance "information is available to Unum if Unum wants it," Ingraham Dep. 42:16-23, 43:12-22.

Once the profits have been disgorged, it remains within the Court's discretion to determine how and to whom the money will be distributed.  *Securities and Exchange Comm'n v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) (citations omitted).  Since the measure of disgorgement need not be tied to the losses suffered by victims, the Court may order disgorgement regardless of whether the disgorged funds will be paid to the victims as restitution.

*Id.* at 176.  However, in the event the Court, in its discretion, distributes the disgorged amounts to the class, there is no need for individualized hearings because the excess amount that Unum earned on the retained benefits above the amounts paid to the beneficiaries is easily ascertainable from existing data sets.  *See* Bessman Dep. 49, *supra*.

This single-count case relies almost totally on financial evidence in Unum's possession. Plaintiffs can "prove their case without significant participation of individual aggrieved applicants."  *See, CEIBA, Inc. v. Ford Motor Credit Co*., 2003 WL 22204560, at *4 (E.D. Pa. 2003). [12]  There are no individualized determinations that preclude certification of these claims for declaratory and injunctive relief.

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for class certification under Rule 23(b)(2) should be granted.

DATED:        June 15, 2009

                              Respectfully submitted,

                              /s/ Stuart T. Rossman
                              Stuart T. Rossman BBO #430640
                              Charles M. Delbaum BBO #543225
                              THE NATIONAL CONSUMER LAW CENTER
                              7 Winthrop Square , 4th Floor
                              Boston, MA 02110
                              (617) 542-8010
                              (617) 542-8028 (fax)

---

12   Although this ERISA class action should be certified under Rule 23(b)(2), the court also has discretion to (i) certify some or all of the claims under Rule 23(b)(3); (ii) certify a hybrid class under Rule 23(b)(2) and Rule 23(b)(3), *see LaFlamme v. Carpenters Local #370,* 212 F.R.D. 448, 459 n.8 (N.D. N.Y.  2003); or (iii) bifurcate the claim and certify the liability stage of the class for (b)(2) treatment.   *See Robinson v. Metro-North Commuter Railroad, Co.,* 267 F.3d 147,167-68 (2nd Cir. 2001) (district court erred in refusing to grant partial certification pursuant to Fed. R.Civ. P. 23(c)(4).

Jeffrey G. Casurella
LAW OFFICES OF
JEFFREY G. CASURELLA
400 Interstate N. Parkway, Suite 310
Atlanta, GA 30339
(770) 858-1660
(770) 858-1665 (fax)

Helen Cleveland
ROBERTS, ERCK & CLEVELAND
945 East Paces Ferry Road
Suite 2220 Resurgens Plaza
Atlanta, GA 30326-1125
(404)760-2792
(404)233-2404 (fax)

M. Scott Barrett
BARRETT & ASSOCIATES
520 North Walnut Street
P.O. Box 5233
Bloomington, IN 47407-5233
(812)334-2600
(812)337-8850 (fax)

John C. Bell, Jr.
Lee W. Brigham
BELL & BRIGHAM
Post Office Box 1547
Augusta, Georgia 30903-1547
(706) 722-2014
(706) 722-7552 (fax)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party via e-mail on June 15, 2009.

/s/ Stuart T. Rossman_____
Stuart T. Rossman (BBO# 430640)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square,  4th Floor
Boston, MA 02110
(617) 542-8010
srossman@nclc.org

*Attorney for the Plaintiffs*

**Exhibit Summary**

Exhibit A:      Materials concerning the Advice & Counsel Newsletter and Gerry Goldsholle.

Exhibit B:      Many Default To The Retained Asset Account, 101 National Underwriter Life & Health issue 38, 1997 WLNR 4682274 (September 22, 1997).

Exhibit C:      Declaration of Stuart T. Rossman

Exhibit 1:      Defendant's Responses to Plaintiffs' Class Certification Interrogatories dated May 4, 2009.

Exhibit 2:      Defendant's Responses to Plaintiffs' First Request for Admissions dated May 4, 2009.

Exhibit 3:      Excerpts from the Deposition of Linda Bessman taken June 4, 2009.

Exhibit 4:      Excerpts from the Deposition of Marlene Ingraham taken May 29, 2009, and Exhibits 33, 44, 46, 47, 48, 49, 51, 53, and 54 thereto.

Exhibit D:      Resumes of Plaintiffs' counsel.